**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LEAGUE OF WOMEN VOTERS OF
THE UNITED STATES, LEAGUE OF
WOMEN VOTERS OF NEW YORK
STATE, and CARMELINA PALMER,

        Plaintiffs,

    v.

PETER S. KOSINSKI, DOUGLAS A.
KELLNER, and ANDREW J. SPANO,
solely in their official capacities as
Commissioners of the New York State
Board of Elections; and TODD D.
VALENTINE and ROBERT A. BREHM,
solely in their official capacities as Co-
Executive Directors of the New York
State Board of Elections,

        Defendants.

Case No. _____

---

## **COMPLAINT**

Date: July 8, 2020

Faith E. Gay
Joshua S. Margolin
Katie Renzler
Shelby P. Rokito
Jordan Weatherwax
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com

Danielle Lang (*pro hac vice* forthcoming)
Dana Paikowsky (*pro hac vice* forthcoming)
Ravi Doshi (*pro hac vice* forthcoming)
Simone Leeper (*pro hac vice* forthcoming)
CAMPAIGN LEGAL CENTER
1101 14th Street NW
Washington, DC 20005
Telephone: (202) 736-2200
Email: dlang@campaignlegalcenter.org

Plaintiffs League of Women Voters of the United States, League of Women Voters of New York State, and Carmelina Palmer, by and through the undersigned attorneys, file this complaint against the Commissioners and Executive Directors of the New York State Board of Elections, Peter S. Kosinski, Douglas A. Kellner, Andrew J. Spano, Todd D. Valentine, and Robert A. Brehm, solely in their official capacities (the "Defendants"), and allege as follows:

## INTRODUCTION

1.     Qualifying New Yorkers have the right to vote by absentee ballot pursuant to New York Election Law § 8-400.  Having created an absentee voting regime, New York is obligated to administer that regime consistent with the U.S. Constitution.  Currently, it does not.

2.     The rate of rejection of absentee ballots in New York is staggering, with tens of thousands of absentee ballots being discarded every election.  In the 2018 general election, 34,095 absentee ballots—nearly 14 percent of those received—were rejected.

3.     In 2018, New York had the *highest* rate of rejection of absentee ballots in the country.  And even though less than 6 percent of New Yorkers voted absentee in 2018—while many states see much higher rates of mail-in voting—New York had the second highest *number* of rejected absentee ballots that year.

4.     Tens of thousands of voters are disenfranchised each election in New York without so much as a notice.  New York election law does not provide for a mechanism by which a voter may defend their absentee ballot and, more fundamentally, their right to vote.  As Defendant New York State Board of Elections Co-Chair

Douglas Kellner stated at the League of Women Voters of the City of New York Annual Meeting, New York does not "have a procedure where if someone challenges an absentee ballot because they left something off the application or the signature doesn't seem to match the voter signature on file, to notify the voter and allow the voter to correct that deficiency."   LWVNYC 202 Annual Meeting of Members, YouTube (June 18, 2020), https://www.youtube.com/watch?v=RafUDysWLA0&feature=youtu.be.   Defendant Kellner acknowledged that "New York needs those kinds of procedures." *Id.*  Indeed, even after an election, there is no requirement under New York law that voters receive notice that their ballot was not counted.

5.     Meanwhile, New York election officials reject absentee ballots for a host of reasons, many of which can be attributed to technical errors that could be corrected if the voter were simply provided notice.  Likewise, many voters could redress other technical errors on their absentee ballot by voting in person or requesting a new absentee ballot, if only they received timely notice of the rejection.

6.     An absentee ballot can be discarded when election inspectors—laypersons with no formal training or expertise in handwriting analysis—determine that the signature on the ballot envelope does not correspond to that on the voter's registration poll record, a signature that can be decades old.  In 2016, nearly 40 percent of all absentee ballots rejected in one New York county were discarded for alleged signature mismatch.  And in 2018, signature mismatches accounted for over 14 percent of absentee ballot rejections in another county.

7.     Likewise, a ballot may be cast aside if the voter inadvertently did not sign the ballot, submitted the ballot in an unofficial envelope, or after dropping the ballot envelope in the mail, it arrived at the county board of elections damaged by the post office.

8.     "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  Defendants' practice of rejecting absentee ballots without providing absentee voters pre-deprivation notice and an opportunity to be heard immediately disenfranchises voters and leaves them in the dark as to whether their vote has been counted.

9.     Because of the ongoing COVID-19 pandemic, exponentially more New Yorkers than ever before will be forced to rely on absentee ballots to cast their votes in the upcoming general election.  In April 2020, Governor Cuomo issued a series of Executive Orders expanding the use of absentee voting in elections that have occurred during the COVID-19 crisis.  Some continued expansion of absentee voting may be necessary to accommodate voters for the November 3, 2020 general election. Without procedural safeguards, more New York absentee voters than ever before stand to suffer the irremediable loss of their right to vote.

10.    New Yorkers' fundamental right to have their absentee votes counted can be safeguarded.  Defendants afford pre-deprivation notice and an opportunity to cure defects jeopardizing the right to vote at other critical junctures, including in-person voting and prior to cancellation of a voter's registration.  Defendants' failure

4

to provide the same basic protections in counting absentee ballots deprives New York-ers of their rights to vote, to due process, and to equal protection of the laws in viola-tion of the First and Fourteenth Amendments of the U.S. Constitution.

## THE PARTIES

### I.    Plaintiffs

11.    Plaintiff League of Women Voters of the United States ("LWVUS") is a nonpartisan, community-based organization that encourages informed and active participation in government and influences public policy through education and ad-vocacy.  Founded in 1920 as an outgrowth of the struggle to win voting rights for women, LWVUS is organized through state and local affiliates in New York, and in all 50 states, as well as the District of Columbia, Hong Kong, and the U.S. Virgin Islands.  LWVUS is active in over 760 communities and every congressional district in the United States, with more than 500,000 members and supporters nationwide. Members pay dues to their local or state affiliates of LWVUS, and, with certain ex-ceptions, $32 per member is allocated to LWVUS, and members of state and local affiliates are LWVUS members as well.  In turn, LWVUS provides support to state and local affiliates, including financial and technical support.

12.    LWVUS's mission is to empower voters and defend democracy, and it works to promote an open governmental system that is representative, accountable, and responsive.  LWVUS has been a leader in pushing for expanded voter access across the country and works with state and local election officials to educate voters on how to effectively cast a ballot.

13.    As part of that work, LWVUS posted and disseminated information about how to vote absentee through its educational website (www.vote411.org), emailed its New York members and supporters, and directed New Yorkers to the absentee voting information via social media.  Between January 1 and June 30, 2020 alone, the educational website served nearly 155,000 New York voters.

14.    Plaintiff League of Women Voters of New York State ("LWVNYS") is the New York State affiliate of LWVUS.  Across New York State, LWVNYS has approximately 3,640 members and 48 local affiliates.  Its New York City affiliate, LWV of the City of New York, is currently LWVNYS's largest local affiliate.

15.    LWVNYS's members have previously voted absentee when unable to go to the polls because of absence or illness.  However, substantially more may vote absentee in New York's upcoming elections this November.  LWVNYS's membership is broad and diverse and includes many individuals who, due to age, underlying health conditions, disability, and where they live, are at heightened risk of contracting severe cases of COVID-19 and are thus more likely to rely on absentee voting to cast their ballots.  Likewise, LWVNYS's diverse membership includes individuals who, due to age or disability, are at heightened risk of being denied the right to vote because of perceived signature issues, including signature mismatch.  Given the high rates of absentee ballot rejection in New York, LWVNYS's members—who are also LWVUS members—have likely been denied the right to vote due to perceived ballot defects in previous elections and are statistically likely to be denied the right to vote due to these issues in upcoming elections.

6

16.     Even before the COVID-19 pandemic, LWVNYS worked to make absentee voting accessible to its members and all New York voters.  As part of that work, LWVNYS provided voters assistance in real time, posted the absentee ballot application on its website, and created and disseminated information about how to vote absentee through its own website (www.lwvny.org), emails to membership lists, and social media.

17.     After the State expanded absentee voting in the wake of the COVID-19 pandemic, LWVNYS expanded its efforts to educate voters about absentee voting options in order to protect its members' health and ensure they are able to participate in the democratic process.  As part of this work, LWVNYS has created and disseminated guides, charts, and videos on how to complete an absentee ballot application and vote by absentee ballot; launched a webpage specifically to answer frequently asked questions about voting in 2020, which includes information on the absentee ballot process; developed a texting service that alerts subscribers to election law changes, such as deadlines for voting by absentee ballot; and posted information for each county on how to vote early, including providing links to find locations, hours, and other relevant details by county.

18.     LWVNYS is a member-led organization.  Its day-to-day activities are managed by a 13-person board, entirely comprised of LWVNYS members.  LWVNYS also uses surveys, conventions, and trainings to solicit input from its members about LWVNYS's activities and to set LWVNYS's policy priorities.

19.     Plaintiff Carmelina Palmer ("Palmer") is a registered New York voter who currently resides in New York City.  Palmer attempted to vote by absentee ballot in the June 23 primary election due to her concern about contracting COVID-19, but had to vote in person because the ballot did not arrive in time to return before Election Day; she hopes to vote absentee in the general election in November.  Palmer has benign essential tremor, or familial tremor, a progressive neurological condition that presently leads her to experience painful tremor sessions in her hands lasting anywhere between thirty minutes to twenty-four hours.  She has between two and fifteen sessions per month.  Because of the constant movement of her hands and the difficulty she experiences applying pressure, Palmer's handwriting is practically unintelligible during these tremor sessions.  As a result, Palmer reasonably believes that she is at substantial risk of disenfranchisement because an absentee ballot envelope she signs during a tremor session would be rejected for signature mismatch.

**II.     Defendants**

20.     Defendants Peter S. Kosinski (Co-Chair and Commissioner), Douglas A. Kellner (Co-Chair and Commissioner), and Andrew J. Spano (Co-Chair and Commissioner) (collectively, the "Commissioners") are sued solely in their official capacities as commissioners of the New York State Board of Elections ("NYS BOE").

21.     Defendants Todd D. Valentine and Robert A. Brehm (the "Co-Executive Directors") are sued solely in their official capacities as Co-Executive Directors of the NYS BOE.

22.     Defendants are all persons within the meaning of 42 U.S.C. § 1983 and act under the color of state law.

23.     The NYS BOE is an administrative agency within the executive department of the New York State government, N.Y. Elec. Law § 3-100(1), responsible for "issu[ing] instructions and promulgat[ing] rules and regulations relating to the administration of the election process, election campaign practices and campaign financing practices," N.Y. Elec. Law § 3-102(1).   NYS BOE Commissioners are appointed by the Governor of New York to coordinate the activities of the NYS BOE for two-year terms.   N.Y. Elec. Law § 3-100(1).

## JURISDICTION

24.     Plaintiffs bring this action under the First and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

26.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

I.    **Voting in New York**

   A.    **Role of the New York State Board of Elections**

28.     The New York State Board of Elections is charged with overseeing the administration of political elections in New York State.   *See* N.Y. Elec. Law § 3-102.

9

Although county-level boards of elections and their related bodies throughout the State manage the logistics and operations of voter registration and the casting and counting of ballots, among other aspects of the election process, the NYS BOE is responsible for overseeing the election process writ large.

29.    As part of its role as election overseer, the NYS BOE has "the power and duty to … issue instructions and promulgate rules and regulations" concerning the election process.  N.Y. Elec. Law § 3-102(1).

30.    The NYS BOE also has the power and duty "to visit boards of elections, examine their procedures and records and direct that any such procedures be modified in any manner consistent" with New York election law.  N.Y. Elec. Law § 3-102(2).

31.    The NYS BOE also fulfills its role through the provision of training materials to county boards of elections.  N.Y. Elec. Law § 3-412(5).

32.    Through its powers and duties, the NYS BOE serves the crucial function of ensuring statewide consistency in voting practices and procedures.

**B.    Role of County Boards of Elections and Inspectors**

33.    Each county in the State, and New York City's five counties collectively, has its own board of elections.  N.Y. Elec. Law § 3-200(1).  These county boards oversee and organize the election process, including the registration of voters and the review of absentee voter applications.  N.Y. Elec. Law §§ 3-212, 8-402.

34.    Election districts serve as the basic political subdivision for purposes of registration and voting.  N.Y. Elec. Law § 4-100(1).  The NYS BOE is responsible for creating these districts.  N.Y. Elec. Law § 4-100(2).

35.     Every year, the county boards of elections appoint election inspectors for one-year terms.  N.Y. Elec. Law § 3-404(1).  Election inspectors are paid per election to assist with the administration of the election, including preparing polling sites, assisting voters, and canvassing and reporting election results.  N.Y. Elec Law § 3-420(1).

36.     The NYS BOE supplies each county board of elections with instructional materials and directions for conducting this examination, as well as an instruction booklet, which must be provided to every inspector.  N.Y. Elec. Law § 3-412(5).

37.     Election inspectors for each district "act as a board," and resolve "all questions" posed to them by a majority vote.  N.Y. Elec. Law § 3-402(1).

38.     New York law provides for a separate group of inspectors, the "central board of inspectors," which is charged with "cast[ing] and canvass[ing]" certain types of ballots.  N.Y. Elec. Law § 9-209(1)(a).  The central board is responsible for absentee, military, and special ballots; ballots cast by voters with registration records missing on election days; and ballots cast by voters who have not had their identity previously verified or who have moved after registering.  *Id.*  Each county board of elections may designate itself or its employees to comprise the central board of inspectors.  *Id*.

39.     At least five days prior to the central board of inspectors' meeting to review the ballots, it is required to "send notice . . . to each candidate, political party, and independent body entitled to have had watchers present at the polls" indicating the time and place designated for the canvass.  N.Y. Elec. Law § 9-209(1)(b).

### C.     Registering to Vote in New York

40.     To participate in an election in New York State, an individual must register to vote.  N.Y. Elec. Law § 5-100.  Generally, when a voter registers in New York, whether in person at the Department of Motor Vehicles, by mail, or by any other means, the voter must submit a signature attesting to their qualifications.  *See* N.Y. Elec. Law §§ 5-204–5-230.  However, any voter unable to sign the registration may note that in the registration application, and that information will be reflected in the voter's record.  N.Y. Elec. Law § 5-216(1).

41.     In addition to the voter's signature, each voter registration record contains, among other information, the voter's name, serial number, date and county of registration, address, birth date, and, at the voter's discretion, their gender, telephone number, and party enrollment.  N.Y. Elec. Law § 5-500(4).

42.     New York law does not require voters to update either their registration record or their signature unless they move outside of the city or county in which they are registered or change their name.  N.Y. Elec. Law § 5-210(5)(a).

### D.     Casting an In-Person Vote

43.     When a voter arrives at their polling place, they are asked to provide their name and address to two election inspectors representing different political parties.  N.Y. Elec. Law § 8-302(1)–(2).  Before casting a ballot, the voter must sign their name on the back of their registration poll record, so the inspectors can compare the voter's current signature to the signature on their registration poll record.  N.Y. Elec. Law § 8-304(1).

44.     If the two election inspectors in charge of comparing signatures are sat-isfied that the voter's signature matches the signature on their registration poll rec-ord, then the voter is permitted to vote.  N.Y. Elec. Law § 8-304(1).  If an inspector believes the voter's signature does not match, then the inspector "shall" challenge the person's right to vote in accordance with the procedures set forth in Section 8-504. N.Y. Elec. Law § 8-304(1); *see also id.* § 8-504 (describing procedures for inspectors to follow when an applicant's right to vote is challenged).

45.     If a voter's eligibility to vote at the polls is challenged—due to signature mismatch or otherwise—the voter is afforded the opportunity to cure the alleged de-fect.  First, the election inspector administers a "Preliminary Oath" to the voter, in which the voter swears to answer truthfully questions regarding their qualifications to vote.  N.Y. Elec. Law § 8-504(1).  After the voter takes the Preliminary Oath, the inspector is to ask the voter questions relating to the reason their right to vote was challenged.  N.Y. Elec. Law § 8-504(2).

46.     If the board of inspectors is satisfied with the voter's answers regarding their qualifications to vote or the challenge is withdrawn, the voter is permitted to vote.  N.Y. Elec. Law § 8-504(3).

47.     Where the voter takes the Preliminary Oath and answers the inspector's questions and the board of inspectors remains unsatisfied that the voter is qualified to vote, the voter is still permitted to cast a provisional ballot upon taking an oath affirming their qualification to vote (the "Qualification Oath").  N.Y. Elec. Law § 8-

504(3). Ballot inspectors record each challenge on the voter's registration poll record. N.Y. Elec. Law § 8-504(8).

48.    A voter will be barred from voting only if, upon one of the challenges mentioned above, the voter refuses to take an administered oath or to answer questions regarding their qualifications to vote. N.Y. Elec. Law § 8-504(1)–(2), (7).

49.    If a voter is required to cast an affidavit or provisional ballot, the board of inspectors will only count the ballot if the board of inspectors subsequently verifies that the voter was in fact registered to vote. N.Y. Elec. Law § 9-209. Election officials are required to "establish a free access system" that these voters can use to ascertain "whether" their votes were "counted, and, if [they were] not counted, the reason that the [votes were] not counted." N.Y. Elec. Law § 9-212(4); *see also id.* § 8-302(3-c) (providing voters with an additional opportunity to learn "whether" their "vote was counted, and, if the vote was not counted, the reason that the vote was not counted").

## II.    Absentee Voting in New York

### A.    Applying for an Absentee Ballot

50.    Registered voters in New York may apply to vote by absentee ballot if they will be absent from their county on election day, suffer from or care for a person with a temporary or permanent illness or disability, are a resident or patient of a Veterans Health Administration Hospital, or are in jail awaiting a Grand Jury action or trial, or following conviction for a non-felony offense. N.Y. Elec. Law § 8-400(1).

51.    In April and May of 2020, Governor Cuomo issued three executive orders that expanded the use of absentee voting for upcoming elections. *See* N.Y. Exec. Order No. 202.15 (Apr. 9, 2020); N.Y. Exec. Order No. 202.23 (Apr. 24, 2020); N.Y. Exec.

Order No. 202.28 (May 7, 2020).  Executive Order 202.15 permitted voters affected by COVID-19, including those who are at risk of contracting COVID-19, to check the box "Temporary Illness" as the reason for requesting an absentee ballot in connection with the June 23, 2020 primary election.  N.Y. Exec. Order No. 202.15, at 3 (Apr. 9, 2020).  Continued expansion of absentee voting eligibility may be necessary in the general election in November 2020 to accommodate voters who fear contracting or spreading COVID-19.[1]

52.     An absentee ballot application must include the voter's full name, the reason for the application, the election in which they intend to vote absentee, their address, and their signature.  N.Y. Elec. Law § 8-400(3), (5).  If a voter is unable to sign the application—due to illness, physical disability, or an inability to read—they may provide a witnessed statement attesting to their inability to sign and make a "mark in lieu of [a] signature."  N.Y. Elec. Law § 8-400(7).

53.     County boards of elections review absentee applications and determine whether a voter meets the qualifications to vote absentee.  N.Y. Elec. Law § 8-402(1). If the county board is not satisfied that the applicant is eligible to vote absentee, the board can order an investigation.  N.Y. Elec. Law § 8-402(2).

54.     If the county board cannot complete the investigation before one day prior to the relevant election, it must deliver an absentee ballot to the applicant if they are a registered voter.  N.Y. Elec. Law § 8-402(4).  If the absentee ballot is sent

---

[1] Indeed, Plaintiffs believe that absent extending this exception to November 2020, New Yorkers' right to vote without risking their safety will be unconstitutionally infringed and reserve the right to bring such a claim if such relief is not provided in a timely fashion.

by mail, the county board must send the absentee ballot with sufficient time for the voter to mark the ballot and return it before the deadline for receipt. *Id.*

55.    If, following an investigation, the county board determines that a voter is not entitled to an absentee ballot, the board "shall immediately notify" the voter and provide the reason for the rejection. N.Y. Elec. Law § 8-402(5). Upon receiving notice of the reason for rejection, a voter can attempt to cure the issue by re-applying to vote absentee or by voting in person.

### B.    Casting a Vote by Absentee Ballot

56.    Once the county board approves a voter's request to vote absentee, the board mails the voter the ballot(s) and return envelope. N.Y. Elec. Law § 8-406.

57.    The voter is instructed to mark the absentee ballot, enclose it in the provided return envelope, and seal the envelope. N.Y. Elec. Law § 8-410. The voter must take and sign the oath set forth on the outside of the envelope. *Id.* Then, the voter must mail the envelope to the board of elections in the voter's county or, for New York City voters, to the New York City Board of Elections. *Id.*

### III.    New York's Absentee Ballot Verification Practices Unconstitutionally Disenfranchise Voters

58.    Once received by the county board of elections, absentee ballots remain in their envelopes until the central boards of inspectors meet. N.Y. Elec. Law § 9-209.

59.    The central board of inspectors is responsible for examining and counting the envelopes and ballots. N.Y. Elec. Law § 9-209(1)–(2)(a)(i).

### A.     Statutory Authority to Reject Absentee Ballots for Minor Defects

60.     New York law provides the central boards of inspectors with broad authority—and indeed responsibility—to set aside voters' absentee ballots for a number of defects, many of which could be cured through notice to the voter.  Even where a defect cannot be cured, timely notice could permit eligible voters to seek a new absentee ballot or cast their ballot in-person.

61.     New York Election Law Section 8-506 provides that "[d]uring the examination of absentee . . . ballot envelopes, any inspector *shall* . . . challenge the casting of any ballot upon the ground or grounds allowed for challenges generally, or (a) that the voter was not entitled to cast an absentee, military, special federal or special presidential ballot, or (b) that notwithstanding the permissive use of titles, initials or customary abbreviations of given names, the signature on the ballot envelope does not correspond to the signature on the registration poll record, or (c) that the voter died before the day of the election."  N.Y. Elec. Law § 8-506(1) (emphasis added).  Section 8-502 generally authorizes challenges so long as they relate to the voter's right to vote or right to vote absentee.

62.     If a majority of the inspectors agrees with the challenge, the ballot is not counted.  N.Y. Elec. Law § 8-506(2).

63.     Section 9-209 also mandates the rejection of absentee ballots for numerous reasons, including if the voter's name and residence do not appear on the registration poll record or if the ballot envelope is unsealed.   N.Y. Elec. Law § 9-209(2)(a)(i)(A).

17

64.    The law does not indicate what process, if any, the central board of inspectors must follow when making the determination whether to reject a ballot for one of the reasons outlined in Section 9-209.

65.    Only if the board "cannot agree as to the validity of the" challenged ballot does it have the chance of being counted.  N.Y. Elec. Law § 9-209(2)(d).  In such cases, the board must set aside the ballot unopened for three days.  If those three days pass without court action, the ballot "shall be opened and the vote counted unless otherwise directed by an order of the court."  N.Y. Elec. Law § 9-209(2)(d).

66.    In each case, regardless of the rationale for rejecting an absentee ballot, New York election law does not require the board of inspectors to provide the voter with notice or an opportunity to be heard.  The central board of inspectors' decision is final and not subject to appeal.  The county has no obligation to inform the voter of the ballot's rejection, and the voter has no opportunity to object to the reason for the rejection or cure any technical defect.  N.Y. Elec. Law §§ 8-506(2), 9-209(2)(a)(i)(A)–(B), 9-209(2)(d).

67.    This lack of notice is unique to the absentee voter.  When an in-person voter's right to vote is challenged, they must still be permitted to cast a vote after answering questions and taking an oath.  *See supra* ¶ 47.  An absentee voter receives no similar process and may never even find out that their ballot was rejected.

**B.    The Rejection of Absentee Ballots Without Notice or Opportunity to Cure Has Led to Unconstitutional Disenfranchisement**

68.    Each election, New York deprives tens of thousands of absentee voters of the right to vote without notice or an opportunity to be heard.

18

69.    The Election Administration and Voting Survey ("EAVS") administered by the U.S. Election Assistance Commission ("EAC") collects data from states and U.S. Territories about how Americans vote and how elections are administered.  *See* U.S. Election Assistance Commission, Election Administration and Voting Survey: 2018 Comprehensive Report 3 (2019), https://bit.ly/2NYQ0Xf.  EAVS reports "provide a detailed snapshot of how general elections are administered in the United States every two years."  *Id*.  Most states, including New York, rely on local jurisdictions to provide responses to some or all EAVS questions.  *Id*. at 4, 136.

70.    EAVS data reflect that absentee ballots are consistently rejected at alarming rates in New York.  In 2014, election inspectors rejected 11,448 absentee ballots—over 7 percent of all such ballots.  In 2016, election inspectors rejected 22,849 absentee ballots—nearly 6 percent of all such ballots.  Most recently and egregiously, in 2018, election inspectors rejected 34,095 absentee ballots—nearly 14 percent of absentee ballots cast in the State.

71.    The alarmingly high rejection rate for absentee ballots in New York, according to EAVS data, suggests that New York voters are needlessly deprived of their right to vote based on simple errors such as a missing signature, use of the wrong envelope to mail their ballot, or failure to seal the envelope.  A missing signature can be easily cured by a subsequent confirmation of the voter's ballot and any envelope errors—if fatal—can be resolved by the voter's casting another ballot either by mail or in-person.  But as Defendant Kellner noted, "if the voter doesn't sign the ballot envelope … there's no system in place for notifying the voter to say 'wait a minute,

you forgot to sign this, here's how you can correct this in time for your vote to count.'" *LWVNYC 2020 Annual Meeting of Members*, YouTube (June 18, 2020), https://www.youtube.com/watch?v=RafUDysWLA0&feature=youtu.be.   Thus, these voters are unnecessarily disenfranchised.

72.     The table below demonstrates the number of absentee voters that have been disenfranchised in New York because of a missing signature, the use of the wrong envelope, or failure to seal the envelope in the last three federal elections.

| Year | Use of Unofficial Envelope | Envelope Arrived Improperly Sealed | Voter Failed to Sign Ballot Envelope |
|------|------|------|------|
| **2014** | 269 | 227 | 1,099 |
| **2016** | 527 | 470 | 6,368 |
| **2018** | 242 | 376 | 6,328 |
| **Total** | **1,083** | **1,073** | **13,795** |

73.     These numbers are almost certainly understated.   Although New York is required to report the number of and reasons for rejected absentee ballots, its data often either fails to note any reason for the rejection, or unhelpfully reports them coded with the catchall "other" category.   Indeed, the *majority* of 2018 rejected absentee ballots—nearly 60 percent or, in raw numbers, 20,127 ballots—in New York were either entirely unaccounted for in the EAVS data or logged as "other."

74.     First, New York's data routinely fails to account *at all* for thousands of discarded votes.   In 2018, New York failed to provide the EAC with any reasons for 18 percent of all reported ballot rejections—accounting for 6,159 rejected absentee ballots.   While the State did somewhat better in 2016 and only failed to report rationales for 8 percent (1,917) of the absentee ballots that were rejected, in 2014 New York

failed to provide the EAC with rationales for more than 38 percent (7,070) of the ballots it rejected that year.[2]

75.    Second, even where the EAVS data account for New York's absentee ballot rejections, "other" is designated as the rationale for thousands of rejections. The number of absentee ballots rejected on this opaque basis has dramatically increased over time.  In 2014, 1,894 ballots—16.5 percent of all rejected ballots—were rejected for some "other" reason.  In 2016, that number increased to 4,349—19 percent of all rejected ballots—and in 2018, the number of ballots rejected on some "other" basis skyrocketed to 13,968—40.9 percent of all rejected ballots.  Worse, in 2018 the State failed to provide any detail on what the "other" rationales for rejection might be until it responded to Plaintiffs' FOIL request.

76.    The explanations for rejections provided in the "other" category in the EAVS 2014 and 2016 data show that the number of ballots rejected for missing signatures and other technical defects may be understated.  The reasons provided in 2014 include "stamped signature POA [power of attorney]," "sign. issue," and "wrong env. Post mark [sic] illegible."  Such categories already exist in the survey instrument—raising the question of why inspectors designated these rejections as "other" and suggesting that the number of ballots rejected for trivial technical defects is likely higher than reported.

---

[2] On March 31, 2020, counsel for Plaintiffs submitted a request to the NYS BOE for updated data to address this deficiency, but the Board's response on May 8, 2020 failed to address it.

77.     Explanations for rejections in the "other" category further illustrate the standardless manner in which election inspectors review and reject absentee ballots. In the 2016 election, inspectors in Broome and Seneca Counties rejected absentee ballots because they purportedly had been damaged by the U.S. Postal Service, and Broome and Duchess County inspectors used a voter's "pencil signature" as a basis for rejection.  In the 2018 election, inspectors in New York County discarded an absentee ballot because it had "extraneous marks or materials on" it.[3]

78.     Some of these explanations are without legal authority or are contrary to the election code.  For example, there is no statutory basis for rejecting a ballot because the envelope was signed in pencil.  Indeed, the relevant statute provides form instructions that expressly permit voters to use a "pen or pencil" to cast their vote. N.Y. Elec. Law § 7-122(d).  Notice and an opportunity to respond are necessary to provide accountability for such unlawful rejections.

79.     New York's statutory scheme does not provide guidelines for how election inspectors ought to treat absentee ballots and envelopes bearing minor blemishes or that have been mishandled *en route* from the voter to the board of inspectors. Moreover, a review of publicly available election inspector manuals reveals no guidance to assist election inspectors in verifying absentee envelopes and ballots that

---

[3] Explanations for absentee ballots categorized as "other" were not provided by the 2018 EAVS reports; therefore, this information is derived from a spreadsheet provided by the NYS BOE in response to a FOIL request dated March 31, 2020.  All other data regarding absentee ballots cited herein is derived from EAVS data.  Plaintiffs note that the EAVS data and the data provided by NYS BOE is inconsistent, and NYS BOE data is also internally inconsistent.

have defects outside of the statutorily designated categories for challenging absentee votes.

80.    Absent due process, absentee voters are deprived of their rights to vote because of innocent—or non-existent—errors, which, in some cases, like signature mismatches or postal damage, may be caused by third parties outside of the voter's control.

81.    Such benign errors are not proper grounds for denying outright a person's fundamental right to participate in an election without any notice or opportunity to cure.  This is particularly so for voters who vote absentee due to physical disability, health issues, or other impairments that may prevent them from being able to cast a vote in person.  These voters are entitled to just as much process as their in-person voting counterparts who are provided notice of and the opportunity to remedy challenges posed to their right to vote.

## C.    The Signature Verification Procedure is Particularly Error-Prone

82.    In addition to other technicalities, absentee ballots are rejected on the basis of New York's signature match procedure—an inherently error-prone process in which laypersons moonlight as handwriting experts to determine whether the signature on a ballot envelope matches the signature on a voter's registration.  If inspectors identify an alleged mismatch, voters are deprived of their right to vote without notice or an opportunity to explain or cure the alleged mismatch.

83.    A person's signature can vary from one execution to the next for any number of reasons, including age, change in mental or physical condition, disability,

and even stress.  This Court has taken note of the inconsistency of handwritten signatures, recognizing that environmental and individual factors may cause variability.  *See, e.g.*, *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 419 (S.D.N.Y. 2016) (observing there is no scientific evidence establishing the range of expected natural variation caused "by the use of different writing instruments or the intentional disguise of one's natural hand or the passage of time"); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1044 (S.D.N.Y. 1995) (noting apparent differences between two signatures may arise "from such sources as natural variation, the passage of time, purposeful  alteration . . . , illness, or intoxication").

84.    The passage of time is a factor contributing to signature variability, which courts have also recognized.  *See Almeciga,* 185 F. Supp. 3d at 419; *Starzecpyzel*, 880 F. Supp. at 1044; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 206, 212 (D.N.H. 2018).

85.    Since New York voters are not required to update the signature on their registration poll record unless their name or address changes, *see supra* ¶ 42, election inspectors regularly compare signatures executed years or even decades apart from one another.

86.    People with degenerative disorders or other physical disabilities that affect the neuromuscular processes used in handwriting—people like Plaintiff Palmer—are disproportionately likely to be erroneously suspected of signature mismatch because of the increased variations their disabilities might produce.

24

87.     Unsurprisingly, natural variations in signatures are difficult, if not impossible, to discern from fraudulent variations, especially where the reviewer has limited exemplars as reference and no meaningful training in handwriting analysis.

88.     Also, when lay evaluators make mistakes, they are much more likely to determine an authentic signature is inauthentic than the reverse, meaning, in this context, they are much more likely to make an error that leads to the disenfranchisement of an otherwise eligible voter.  According to one study, lay evaluators incorrectly judged authentic signatures as nongenuine—a decision that, in practice, would result in disenfranchisement—in 26.1 percent of all cases.  They made the opposite error, declaring false signatures to be authentic, in about 7 percent of cases.  In both situations, the lay evaluators' error rates were between three and seven times higher than those of professionals.  *See* Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. of Forensic Sci. 884, 884 (2001).

89.     Even assuming handwriting analysis can ever be performed accurately, a group of laypersons who lack expertise, specialized knowledge, or even basic training in verifying handwritten signatures cannot be expected to consistently and accurately do so.

90.     The EAVS data shows that nontrivial numbers of absentee ballots are thrown away due to supposed signature mismatch.  For example, in the 2014 election, 27 percent of the absentee ballots rejected in Sullivan County were rejected due to non-matching signatures.  That rate increased in 2016, when nearly 40 percent of rejected absentee ballots in Sullivan County were rejected for this reason.  More

recently, Nassau County election inspectors discarded nearly 7 percent of all absentee ballots it received in 2018, and more than 14 percent of those rejections were for supposed signature mismatch.

91.    Moreover, the EAVS data on signature mismatch is necessarily under-inclusive.  As described, *supra* ¶ 73, over 20,000 absentee ballots in New York were unaccounted-for or listed as "other" in 2018.  A review of public data provided by the NYS BOE also demonstrates that many signature mismatches have been coded as "other."  Thus, the true number of rejected ballots for signature mismatch is unknown and New York law does not provide uniform guidance to election inspectors for evaluating and comparing voters' signatures.  Moreover, upon information and belief, Defendants do not provide training, instructions, or written standards to election inspectors regarding how to determine whether the signature on an absentee ballot envelope matches the signature on a voter's registration poll record.  Likewise, county boards of elections either do not provide such training or do so inconsistently, leaving election inspectors to operate without functional standards.

### D.    New York's Absentee Ballot Review Procedures Lack Uniformity

92.    Election materials received from nineteen counties in response to public records requests[4] demonstrate the lack of uniformity and functional standards in the absentee ballot review process.

---

[4] On May 21, 2020, Plaintiffs submitted Freedom of Information Law ("FOIL") requests to the New York State Board of Elections and all 62 county boards of elections in the State of New York seeking materials regarding the counting of absentee ballots, the absentee ballot

93.     Of the 62 county boards of election in New York, nineteen have provided materials[5] and five have responded that they do not have materials to provide.[6]   The remaining 38 counties have not responded either way.

94.     Of the materials received, none include any guidance or refer to any training regarding signature matching.   Although not required by New York law, eleven counties' materials include instructions about how to address other issues that may invalidate absentee ballots, such as missing signatures and late postmarks.   Ten counties' materials appear to give voters some form of notice that their absentee ballot has been rejected.

95.     The ten counties that appear to give voters some form of notice for some of the reasons used to reject a ballot vary significantly in the manner and timing of notice.   In Yates County, for example, voters are to be notified "by the quickest manner" if their ballots "lack[] the required signature or date," but "the quickest manner" is undefined.   In Steuben County, a voter "*may* be notified" if their ballot lacks a "proper signature" or is not secured in the oath envelope (emphasis added).

96.     Of these counties, nine appear to provide *some* opportunity to cure *some* defects; but none of the materials provided indicate there is any opportunity to cure signature mismatches.   Moreover, voters' opportunities to address and cure defects—

---

review process, the process for determining challenges to absentee ballots, the reasons an absentee ballot may not be counted, and the comparison of signatures on absentee ballot envelopes.

[5] Albany, Chemung, Cortland, Delaware, Essex, Franklin, Greene, Herkimer, Jefferson, Orange, Otsego, Rockland, Schoharie, Schuyler, Steuben, Tioga, Warren, Washington, and Yates Counties.

[6] Cayuga, Chautauqua, Erie, Oswego, and Sullivan Counties.

where there are any—vary across counties.  For example, Rockland County allows voters to mail in a new ballot until the day before the election if the original oath envelope was not used, signed, or dated.  And Steuben County returns "[b]allots without a proper signature" to "voter[s] for correction in the allotted time," but "allotted time" is nowhere defined.

### E.   The COVID-19 Pandemic Will Increase the Number of Absentee Voters in New York and the Rate of Disenfranchisement

97.   Because of the COVID-19 pandemic, New Yorkers have and will continue to rely on absentee voting to cast their ballots in unprecedented numbers.  In the June 23, 2020 primary, New York County reported transmitting 219,440 absentee ballots to voters, up from the 33,498 absentee ballots the County sent out for the 2018 general election.  That represents a 655 percent increase in absentee ballots transmitted to voters in just one county during a primary election, in which turnout is historically much lower.  If New York's standardless process for reviewing absentee ballots and the lack of notice or opportunity to cure are permitted to continue in the 2020 November election, many more absentee voters will suffer erroneous deprivation of their right to vote.

98.   New Yorkers usually vote by absentee ballot relatively rarely.  In recent years, about 6 percent of voters requested absentee ballots in New York, and 4 to 5 percent actually cast them.  However, even before the pandemic, the number of absentee voters in New York had been growing.  In the 2014 mid-term election, 154,069 New Yorkers voted absentee, as compared to 249,002 in the 2018 mid-term election.

The 2012 presidential election saw 326,189 absentee voters in New York, as compared to 402,151 in 2016.

99.     Absentee voting is likely to become increasingly prevalent.  If the rates of absentee ballot rejection in New York are allowed to persist, tens of thousands of voters will suffer erroneous deprivation and irremediable disenfranchisement.

## IV.    The Failure to Provide Voters Notice and an Opportunity to Cure a Rejected Absentee Ballot is Unconstitutional

### A.    Defendants Provide Pre-Deprivation Process in Other Voting Contexts

100.     New York law requires voters to be notified of a challenge to their right to vote prior to being deprived of the right at every other step of the voting process including registration, applications for absentee voting, and at the polls.

101.     When a county board of elections seeks to cancel a voter's registration, the board must provide notice by mail inviting the voter to "stat[e] the reasons why his registration should not be cancelled."  N.Y. Elec. Law § 5-402(2).  The voter is then given fourteen days to answer in writing or appear prior to cancellation of their registration.  *Id.*

102.     Likewise, when a voter's application to vote by absentee ballot is challenged or otherwise found to be deficient, the voter is immediately notified and informed of the reason for the rejection.  *See supra* ¶ 55; N.Y. Elec. Law § 8-402(5).  Nothing prevents the voter from reapplying and, if possible, resolving the basis for the initial rejection or choosing to vote in person.

103.     When a voter's eligibility to cast their vote is challenged at the polling place, the voter is informed of the challenge, required to answer questions posed by

an inspector, and ultimately permitted to cast a vote upon taking the Qualification Oath (or other, relevant oath)—even if the inspector is not satisfied that the voter is eligible. *See supra* ¶ 47; N.Y. Elec. Law § 8-504(3).

104.    But such pre-deprivation process is conspicuously absent at the stage of verifying an absentee ballot.  Once an absentee voter drops their ballot in the mail, they may never know whether their vote is counted, let alone have the opportunity to remedy or defend against a challenge jeopardizing their right to vote.

105.    The fact that Defendants already provide notice and an opportunity to voters to address challenges in other contexts—including the absentee ballot application stage—demonstrates that implementing procedural safeguards at the absentee voting stage would not be unduly burdensome.

106.    Providing such process would save tens of thousands of ballots cast by eligible voters from being disregarded for benign errors or technicalities.

**B.    Other States Have Implemented Pre-Deprivation Procedures to Provide Notice and an Opportunity to Cure Absentee Ballot Defects Prior to Deprivation of the Right to Vote**

107.    Sixteen states that use signature matching have a statutory notice provision and provide an opportunity to cure the discrepancy. *Verification of Absentee Ballots*, Nat'l Conf. of State Legislatures (Jan. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/verification-of-absentee-ballots.aspx   (last   visited July 2, 2020).

108.    Like these other states, New York can and must afford its voters constitutionally-mandated safeguards, and prevent tens of thousands of votes from being

discarded on account of benign errors or handwriting technicalities that can be easily and timely explained or corrected.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Denial of Due Process
### Under the Fourteenth Amendment

109.   Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

110.   An individual has a liberty interest in the fundamental right to vote that is protected by the right to due process.  *See Reynolds v. Sims*, 377 U.S. 533, 554–55 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370–71 (1886); *see also Williams v. Sclafani*, 444 F. Supp. 906, 910–11 (S.D.N.Y. 1978), *aff'd sub nom. Williams v. Velez*, 580 F.2d 1046 (2d Cir. 1978) ("It is well settled that voting is a fundamental right . . . which includes the right to . . . have that vote counted . . . .").

111.   New Yorkers have a statutorily protected liberty interest in voting by absentee ballot.  *See* N.Y. Elec. Law § 8-400; *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies . . . .").

112.   At a minimum, where a protected interest is at stake, due process requires notice and the opportunity to be heard.  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) ("[T]here can be no doubt that at a minimum [Due Process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing . . . .").

113.   Where the action being challenged is an established state procedure, notice and opportunity to be heard must be provided *pre*-deprivation.  *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (citing *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)).

114.   Defendants' practice of rejecting absentee ballots for benign errors or technical defects without mandatory pre-deprivation notice or opportunity to cure contravenes the most basic requirements of due process.

115.   In order to determine how much process is due in any given situation, a court must consider and balance three factors:  (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

116.   Here, the "private interest" is nothing less than the fundamental right to vote, "preservative of all rights."  *Reynolds*, 377 U.S. at 562.

117.   The risk of systematic erroneous deprivation resulting from benign error in the submission of an absentee ballot, including signature discrepancies or other technical defects is significant.  Defendants' practice of rejecting absentee ballots on such grounds will, by its very design, disenfranchise voters due to technicalities.

118.    With regard to signature verification, election officials are not trained handwriting experts; many factors lead to signature variation over time; and the standardless process heightens the risk of erroneous deprivation of the right to vote. Moreover, an inadvertent failure to sign a ballot envelope is more indicative of simple user error than fraud.

119.    Implementing procedures to provide absentee voters with notice and an opportunity to cure would not impose an undue burden on the State.  Defendants and county boards of elections already maintain records in the ordinary course of business that contain voter contact information.

120.    Any administrative burden associated with providing voters timely notice that their absentee ballot may be rejected, and an opportunity to cure the error, is minimal.

121.    Whether an absentee ballot is rejected on account of signature mismatch or another perceived technical defect or benign error, the voter is entitled to proper notice of the defect and an opportunity to fix the issue either by curing their ballot, re-submitting a ballot, or voting in-person.

122.    Defendants' failure to provide absentee voters such procedural due process is a violation of the Fourteenth Amendment.

## **SECOND CLAIM FOR RELIEF**

### **42 U.S.C. § 1983: Denial of the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments**

123.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

124.    "There is no right more basic in our democracy than the right to partic-
ipate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014).
"[V]oting is of the most fundamental significance under our constitutional structure."
*Burdick v. Takushi*, 504 U.S. 428, 433–44 (1992).

125.    When analyzing the constitutionality of a restriction on voting, the
Court "must weigh 'the character and magnitude of the asserted injury to the rights
protected by the First and Fourteenth Amendments that the plaintiff seeks to vindi-
cate' against 'the precise interests put forward by the State as justifications for the
burden imposed by its rule,' taking into consideration 'the extent to which those in-
terests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434
(quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Price v. New York
State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008).

126.    Defendants reject a significant number of validly cast ballots every elec-
tion cycle as a result of unintended discrepancies or technical errors.  Defendants
regularly deny the individuals who cast these ballots the right to vote without any
pre-deprivation notice or opportunity to challenge or cure supposed defects.  Such a
system imposes a severe burden on voters' fundamental right to vote.

127.    The severity of this burden is exacerbated by voters' need, in light of the
COVID-19 pandemic, to rely on absentee ballots to exercise their right to vote without
compromising their health or the health of fellow citizens.  Voters should not be re-
quired to risk their health or lives or the lives of others to cast a ballot they can be
confident will count.

128.    Defendants can proffer no justification for procedurally deficient ballot verification procedures that would outweigh the injury of the rejection of thousands of ballots each election without any reliable indication that those ballots were fraudulent or improper.

129.    In particular, New York's signature verification system is not designed to carefully ferret out fraud but rather to sweep numerous eligible voters into its net. Each time the majority of a county board of elections—comprised of laypersons with no expertise in handwriting analysis—subjectively believes there is a mismatch between the signature on the voter's absentee ballot envelope and the signature in the voter's registration poll record, that ballot is cast aside, notwithstanding the many factors that contribute to signature variation over time.  And those factors—which may include age, disability, language abilities, or educational background—can place vulnerable voters at heightened risk.

130.    New York's absentee ballot verification procedures unduly burden the right to vote in violation of the First and Fourteenth Amendments.

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Denial of Equal Protection Under the Fourteenth Amendment

131.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

132.    The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated [] be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

133.   "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *see also id.* at 105–06 (explaining the "fundamental right to vote" is not sufficiently protected where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county").

134.   In the absence of statewide standards, New York's unreliable and error-prone absentee ballot verification procedures subject absentee voters to arbitrary differences in the way their ballots are counted depending on the county in which they reside and, in some circumstances, depending on the election inspector that draws their ballot.

135.   The lack of adequate and uniform standards in New York's absentee ballot verification procedures does not further any compelling or legitimate state interest sufficient to justify the unequal treatment of voters.

136.   New York's absentee ballot verification procedures violate the Equal Protection Clause of the Fourteenth Amendment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, issue a declaratory judgment that New York's practice of rejecting absentee ballots without notice or opportunity to be heard unlawfully infringes the right to procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution;

36

*Second*, issue a declaratory judgment that New York's absentee ballot verification procedures, including the signature match requirement, unduly burden the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States;

*Third*, issue a declaratory judgment that New York's absentee ballot verification procedures, including the signature match requirement, unlawfully infringe the guarantee of equal protection in violation of the Fourteenth Amendment to the U.S. Constitution;

*Fourth*, issue a permanent injunction enjoining Defendants, their agents, employees, and successors, and all those persons acting in concert or participation with them from rejecting absentee ballots without proper notice and an opportunity to be heard;

*Fifth*, enter an order requiring Defendants to promulgate standards for absentee ballot verification to be applied uniformly across counties throughout the State;

*Sixth*, grant Plaintiffs' attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12133; and

*Seventh*, grant other and further relief that the Court may determine to be necessary and proper.

Dated:  July 8, 2020                    Respectfully submitted,
        New York, NY


By:  /s/ *Joshua S. Margolin*
     Joshua S. Margolin
     Faith E. Gay
     Katie Renzler
     Shelby P. Rokito
     Jordan Weatherwax
     SELENDY & GAY PLLC
     1290 Avenue of the Americas
     New York, NY 10104
     Telephone: (212) 390-9022
     E-mail: jmargolin@selendygay.com

     CAMPAIGN LEGAL CENTER
     Danielle Lang (*pro hac vice* forthcoming)
     Dana Paikowsky (*pro hac vice* forthcoming)
     Ravi Doshi (*pro hac vice* forthcoming)
     Simone Leeper (*pro hac vice* forthcoming)
     1101 14th St. NW, Suite 400
     Washington, DC 20006
     Telephone: (202) 736-2200
     E-mail: dlang@campaignlegalcenter.org

     *Attorneys for Plaintiffs*